**Marie BELARDINELLI, individually, and as Administratrix of the Estate of Pedro Belardinelli, deceased, Plaintiffs,**

**v.**

**Billy Eugene CARROLL, Great Coastal Express, Inc., and Nationwide Insurance Co., Defendants.**

**Civ. A. No. 90–106–JLL.**

United States District Court,
D. Delaware.

Sept. 13, 1991.

---

difference between these two statements repre-

sents, but it is irrelevant to the Court's analysis.

Kurt J. Doelze, Wilmington, Del., for plaintiffs.

Gary H. Kaplan of Goldfein & Joseph, Wilmington, Del., for defendants Great Coastal Express, Inc. and Billy Eugene Carroll.

Paul M. Lukoff of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendant Nationwide Ins. Co.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

At the trial in this case, the jury awarded compensatory damages of $500,000 to the decedent's estate and $250,000 for loss of consortium to the decedent's wife for personal injuries Pedro Belardinelli sustained in a three vehicle accident.[1] The jury found no contributory negligence on the part of the elderly plaintiff decedent and allocated equal responsibility for the accident to the drivers of the other two vehicles.[2] The defendants have moved for remittitur.

---

1. The jury found that Mr. Belardinelli's injuries were proximately caused by a truck negligently operated by Billy Eugene Carroll and owned by Great Coastal Express, Inc., and an unidentified blue Thunderbird that fled the scene of the accident. Nationwide Insurance Company defended the blue Thunderbird under an uninsured motorist clause in its automobile insurance contract with Mr. Belardinelli.

2. Negligence and proximate causation are not at issue. The plaintiff presented adequate evidence to support the first three elements neces-

The Court may grant a new trial, in its discretion, if the jury award is so excessive so as to "shock the judicial conscience." [3] *Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 771 (3rd Cir.1987)

> A jury has very broad discretion in measuring damages; nevertheless, a jury may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket. There must be a rational relationship between the specific injury sustained and the amount awarded.

*Id.* at 773. If a portion of the award is rationally related to the evidence, the Court may condition granting a new trial on the plaintiff's failure to remit a specified portion of the jury award. *Id.* at 772.

When evaluating the award, the Court may not substitute its judgment for that of the jury. *Carpenter v. Koehring Co.,* 391 F.Supp. 206 (E.D.Pa.1975), *aff'd,* 527 F.2d 644 (3d Cir.1976). The verdict, if supported by evidence, must be permitted to stand if nothing suggests that the jury was in any way guided by partiality, prejudice, mistake or corruption. *Id.* at 212; *Stoughton v. Kinzey,* 299 Pa.Super. 499, 445 A.2d 1240, 1242 (1982) (citing *Bell v. Yellow Cab Co.,* 399 Pa. 332, 160 A.2d 437, 439–40 (1960)). Any reduction of the award must not fall below the maximum amount "which the jury could reasonably find" to protect the guarantees in the Seventh Amendment. *Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d at 772 (discussing standard in *Gorsalitz v. Olin Mathieson Chemical*

*Corp.,* 429 F.2d 1033, 1046–47 (5th Cir. 1970)).

For the reasons stated below, the awards in the present case are excessive and remittitur is appropriate. The awards are not rationally related to the evidence and the evidence suggests that the jury may have mistakenly believed that compensation was sought for the decedent's death.[4]

## I. *The Award Is Not Rationally Related To The Evidence*

Remittitur is appropriate for each award to each plaintiff. The damages relating to each plaintiff are addressed separately.

### A. Compensation for the Decedent's Estate

As discussed in *Gumbs,* the jury has broad discretion in measuring damages. The jury compensated the decedent in the amount of $500,000 for the permanency of the injury and for his pain and suffering.[5] The plaintiff submitted unrebutted evidence that the elderly decedent suffered severe physical injuries to his leg and ankle requiring substantial medical treatment. The plaintiff also presented evidence that these injuries were proximately caused by the accident. While the evidence supports compensation, it does not support the amount awarded.

#### 1. *Severity of the Injury*

Dr. Steinfield[6] diagnosed and treated the decedent for a bimalleolar fracture of the right ankle, a laceration of the right knee,

---

sary for liability and the parties do not contest this finding.

**3.** All parties agree that Pennsylvania substantive law controls, that federal law governs whether a remittitur is appropriate, and that the legal standard to be used when determining whether a verdict is excessive is whether the verdict shocks the conscience of the court. The parties disagree as to the characterization and the sufficiency of the evidence.

**4.** Mr. Pedro Belardinelli died from causes unrelated to and not proximately caused by the accident. The plaintiffs did not allege wrongful death and any compensation for his death would be improper.

**5.** The jury was instructed that Delaware's "No–Fault" insurance law ensured compensation for

medical and hospital expenses, expenses for medications, x-rays, incidental expenses and for lost wages. *Charge to the Jury,* Latchum, J., 25 (June 11, 1991). Therefore, the plaintiff could not recover in this case for such damages. The award was only to compensate the decedent for pain and suffering and for permanency of the injury.

**6.** Dr. Paul H. Steinfield is a Board certified orthopedic surgeon in Philadelphia. (D.I. 84 at A–180–182). Mr. Pedro Belardinelli was admitted to the emergency room of the Crozer–Chester Medical Center after the accident and referred to Dr. Steinfield for surgery. (D.I. 84 at A–184).

and a fracture of the right patella after the accident. (Docket Item ["D.I."] 84 at A–189 to 190) (Trial Transcript, Volume A). That the plaintiff suffered pain associated with these injuries was supported by the police officer at the scene, by the hospital reports after the decedent's first admission to the hospital, and by Dr. Steinfield. (D.I. 84 at A–81; PX # 11). The decedent's pain exceeded that of a normal fracture because of the two injuries to the same leg. (D.I. 84 at A–211).

The treatment resulted in the removal of forty percent of the patella cap, affecting the quadricep muscle. The initial prognosis stated that, as a result of this medical treatment, the decedent would have a limited range of motion in his knee, weakness in the leg, a limp, and occasional discomfort. (D.I. 84 at A–203, 206). Although the record shows several medical notations of recovering and completely healed wounds, the decedent's condition deteriorated. (PXs # 4, 7, 11). To summarize the decedent's treatment, he was admitted to the hospital three times, underwent two surgeries and a skin graft operation. He suffered infections, the screws inserted to heal the ankle protruded through the skin graft at one point, and eight office visits were required. (D.I. 84 at A–189, 192, 194, 197, 201, 203; D.I. 83 at B–9, 12; PXs # 4, 11).

Dr. Raisis [7] testified from repeat x-rays taken approximately a year later that the decedent had a post traumatic condition and that this condition resulted from the accident. (D.I. 83 at B–13 to 15). The x-rays showed an almost complete loss of articular cartilage of the tibiotalor joint and arthritis in his ankle joint. (D.I. 83 at B–13 to 14). The lost cartilage, likely to produce pain and inflammation, appeared to explain why the decedent walked very slowly, with the use of a walker, and with significant pain. (D.I. 83 at B–12, 14). Dr. Raisis, on November 1, 1990, the last time he saw the decedent, advised him to try to keep the leg immobile and to minimize motion in order to decrease inflammation. (D.I. 83 at B–

18). Thus, the decedent for the last four months of his life spent most of his time in bed and did not walk. (D.I. 83 at B–17, 18). The disabling effect on the decedent's lifestyle in the four months before he died was also supported by testimony from the decedent's daughter and wife. (D.I. 84 at A–116, 255). Given this evidence, the jury properly decided to compensate the decedent's estate for pain and suffering and permanent injuries.

The jury award, however, was excessive given the fluctuating degree of pain and the fact that other serious medical factors significantly contributed to the decedent's reduced activity and mobility. First, the pain suffered by the decedent was concentrated at two time periods, not constant over the twenty-two months between the injury and his death. Over the remaining two-thirds of the decedent's recovery, neither the pain nor the injuries severely restricted his activities.

As discussed *supra*, while the decedent experienced pain as a result of the accident, he only intermittently complained of pain during his first hospital stay. (D.I. 84 at A–152; PX # 11). After his release, the decedent testified that he experienced little pain and that he was given no medication for pain. (D.I. 84 at A–154 to 156). Since his leg and ankle did not hurt when it was resting, the decedent had no pain while stationary, when playing cards, attending church, or visiting friends. (D.I. 84 at A–169). He would only experience pain walking or driving to his destination but his wife and his local daughter were able to drive and could have minimized the pain. (D.I. 84 at A–165 to 166, 252). In fact, it was noted that the decedent was ambulatory with no mention of significant pain until July 8, 1990, (D.I. 84 at A–221; D.I. 83 at B–7, 12; PX # 11), and that he was not bedridden until November of 1990. (D.I. 84 at A–255; B–17).

Second, although the decedent limited his activities after the accident, he could reasonably have been expected to discontinue

---

7. Dr. Leo W. Raisis is a Board certified orthopedic surgeon in Delaware. (D.I. 83 at B–3, 5, 6). Mr. Pedro Belardinelli was referred to Dr. Rais-

is for evaluation by his family physician, Dr. Roger Rodrigue. (D.I. 83 at B–6).

many of these activities in time given his age and medical condition. The decedent was 70 years old with a history of severe heart problems. More specifically, a history of congestive heart failure, coronary artery disease, hypertension, and a venous condition as a result of his heart problems. (D.I. 84 at A–133, 240 to 241; D.I. 83 at B–20; PXs # 3, 11). The decedent had undergone a "coronary artery bypass" and a "triple A resection" two years earlier. (PX # 11). As a result of this condition, the decedent could not perform "hard work" and had already curtailed his activities. (D.I. 84 at A–133).

The decedent also had previous eye operations for cataracts, problems not related to the accident, and before he died his eyes deteriorated so significantly that he could not watch television. (D.I. 84 at A–129 to 130, 258; PX # 11). The decedent testified that it was this pre-existing, unrelated eye problem that forced him to leave his employment as a foster grandparent. (D.I. 84 at A–130).

### 2. *Permanence of the Injury*

By its award, the jury accepted the plaintiff's evidence proving the permanency of the decedent's injuries. As discussed *supra*, the decedent lost forty percent of his kneecap and almost all of the cartilage in his ankle joint. Dr. Raisis testified that in November of 1990 he advised the decedent that he could not be treated with medication, surgery or any other medical means due to his heart condition and that his condition would never improve. (D.I. 84 at A–117; D.I. 83 at B–13–16; PX # 11). Based upon this evidence, the jury could conclude that these effects were permanent. "Permanency" in this case, however, was for a period less than two years before he died from other causes.[8] The large compensatory award for such a brief period shocks this Court's conscience.

### B. Loss of Consortium Compensation

 Pennsylvania courts permit either spouse to recover for loss of consortium,

recovery for their right to the society, companionship, and affection. *Burns v. Pepsi–Cola Metropolitan Bottling Corp.*, 353 Pa.Super. 571, 510 A.2d 810 (1986). The consortium claim is grounded on the loss of the spouse's services and the disruption to the family life caused by those services. *Id.* 510 A.2d at 812. These damages are measured from the time of the injury until the date of the spouse's death. *Novelli v. Johns–Manville Corp.*, 395 Pa.Super. 144, 576 A.2d 1085, 1087 (1990), *appeal den.*, 592 A.2d 42 (Pa.1991).

 Based on the evidence, the wife is entitled to some recovery. The wife testified that they had a "beautiful" relationship and that they jointly shared many family and household activities. (D.I. 84 at A–250, 251). The substantial amount of care given to the decedent after he became bed-ridden disrupted their normal range of activities. Furthermore, since the decedent could no longer help with household responsibilities and operation of the family automobile, the wife also lost services normally performed by her husband. (D.I. 84 at A–253 to 254).

The amount awarded, however, shocks the conscience of this Court. There is no evidence of damage to their sexual relationship, separation or marital discord. They continued to love and support each other after the accident. (D.I. 84 at A–256). Although she lost household support from her husband, the decedent had ceased performing many activities due to his age and serious heart condition. (D.I. 84 at A–133). There is no evidence of any special services or unusually close marital bond that justifies the award. They did not depend upon each other to jointly support their children, grandchildren, or a business. In fact, the decedent's testimony concerning his changed lifestyle does not involve his wife with respect to activities other than household or family. (D.I. 84 at A–163 to 168).

Although the wife is entitled to recover, this recovery should be judged with respect

---

8. Plaintiff suffered his injuries on May 24, 1989 (D.I. 58, ¶ 1) and he died on March 31, 1991 (D.I. 63, ¶ 1).

**662**

to the minimal responsibilities performed, the amount of companionship lost, and the short time period for which they were lost. In effect, considering that the decedent only lived twenty-two months, the jury compensated the wife approximately $11,-360 per month for light housekeeping, gardening, acting as a chauffeur, and for some limitation of their normal joint activities. This amount is clearly excessive and it must be reduced in the interest of justice.

## II. *The Evidence Suggests Jury Mistake*

One explanation for the exorbitant amount is the parties' failure to clarify the actual damages sustained. In this case, although not a wrongful death case, the jury may have mistakenly believed that the estate should be compensated for the decedent's death. The officer at the scene believed the injuries to be "severe", there were repeated references to the decedent's "last months", the plaintiff offered repeated testimony as to the decedent's worsening pain and deteriorating condition after the accident, the decedent's daughter testified that the decedent "lost all desire to live" because of the accident, and the decedent's wife testified that she "lost her husband" as a result of the accident. (D.I. 84 at A–107, 116, 118, 258; D.I. 83 at B–17). This evidence suggests that the jury may have been guided by a mistaken belief that compensation was also sought for the decedent's death.

## III. *Conclusion*

Although both plaintiffs are entitled to damages as a result of the accident, the awards are excessive. Granting the defendants' motions for remittitur is appropriate. The award to decedent's estate is limited to only pain and suffering and for permanency of the injuries. The personal injuries sustained only became disabling at the very end of the decedent's life and the decedent died of unrelated causes shortly thereafter. Also, many of the decedent's activities had been curtailed even without the injuries based upon the decedent's advanced age and his eye and heart problems. Furthermore, the evidence shows the loss of minimal services and ordinary companionship, neither of which will support the jury award for loss of consortium.

Based upon the evidence, the maximum amount that a jury could have reasonably awarded is $100,000 to the estate and $50,000 to the wife for loss of consortium. Since part of the jury award is rationally related to the evidence submitted, the Court will enter an order granting defendants' motion for a new trial on the issue of damages, unless plaintiff consents to remit the portions of the jury awards in excess of the maximum amount supportable by the evidence. The plaintiffs, by a date to be set by the Court, must agree to accept a judgment in favor of the estate in the amount of $100,000 and a judgment in favor of the wife in the amount of $50,000 to be entered against the defendants jointly and severally.

An order will be entered in accordance with this Memorandum Opinion.